# UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | No. 1:04CV0085 |
| Plaintiff, | Judge JUDGE WELLS |
| v. | Magistrate Judge |
| CORRPRO COMPANIES, INC. | MAG. JUDGE HEMANN |
| Defendants. | |

## SECURITIES AND EXCHANGE COMMISSION'S COMPLAINT FOR PERMANENT INJUNCTION AND OTHER EQUITABLE RELIEF

Plaintiff, the Securities and Exchange Commission ("Plaintiff" or "Commission"), alleges as follows:

### NATURE OF THE ACTION

1. This action involves financial misstatements by Corrpro Companies, Inc. ("Corrpro"), a U.S. public corporation based in Medina, Ohio, that were caused by fraud in Corrpro's Australian subsidiary which was not detected by Corrpro's internal controls until February 2002. From approximately October 2000 through February 2002, Greg Waring ("Waring"), the managing director of Corrpro Companies Australia Pty., Ltd. ("Corrpro Australia"), Corrpro's Australian subsidiary, and Craig Treloar ("Treloar"), the financial accountant of Corrpro Australia, falsified the subsidiary's accounting records in order to inflate its net income and its net assets.

2. In turn, Corrpro misstated its financial statements after incorporating the false numbers from Corrpro Australia. Corrpro failed to discover the falsification of Corrpro Australia's statements until February 2002 due to its inadequate internal controls. Corrpro restated its net income for 2001 by $3.6 million, increasing previously reported net loss of $4.7 million to $8.3 million, and reducing net worth by $3.8 million.

3. Corrpro, directly or indirectly, has engaged in, and unless restrained and enjoined by this Court will continue to engage in, transactions, acts, practices, and courses of business which violate Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78m(a), 78m(b)(2)(A) and 78m(b)(2)(B)] and Rules 12b-20, 13a-1 and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-13].

4. The Commission brings this action to enjoin such transactions, acts, practices and courses of business pursuant to Sections 20(e), 21(d) and 21(e) of the Exchange Act [15 U.S.C. §§ 78t(e), 78u(d) and 78u(e)].

## JURISDICTION AND VENUE

5. The Court has jurisdiction over this action pursuant to Sections 21(d), 21(e) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e) and 78aa].

6. Venue is proper in this Court pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa].

7. Corrpro is a resident of and transacts business in Ohio.

8. Personal jurisdiction is satisfied here. Corrpro committed the violations alleged herein while located in Medina, Ohio.

9. The acts, practices and courses of business constituting the violations herein occurred within the jurisdiction of the United States District Court for the Northern District of Ohio and elsewhere.

10. Corrpro has made use of the means and instrumentalities of interstate commerce in connection with the acts, practices and courses of business alleged herein in the Northern District of Ohio and elsewhere.

11. Corrpro will, unless enjoined, continue to engage in the acts, practices and courses of business set forth in this Complaint and acts, practices and courses of business of similar purport and object.

## **DEFENDANT**

12. Corrpro Companies, Inc. ("Corrpro") is an Ohio corporation with its principal place of business in Medina, Ohio. Corrpro provides corrosion control engineering and related services and products to infrastructure, environmental and energy markets. Corrpro's common stock is registered with the Commission pursuant to Section 12(g) of the Exchange Act and is traded on the American Stock Exchange under the symbol CO. During the relevant period, Corrpro filed required reports with the Commission pursuant to Section 13(a) of the Exchange Act.

13. Corrpro has been the subject of prior Commission action. In previously instituted cease-and-desist proceedings, the Commission alleged that during the period April 1, 1994 through March 31, 1995, Corrpro's former president, chief financial officer and comptroller recorded, authorized or approved erroneous entries on Corrpro's books, and failed to record entries which should have been recorded. The Commission also alleged that the officers failed to

implement or to maintain proper and adequate accounting procedures or internal controls at Corrpro. The company and the former officers submitted offers of settlement, which the Commission accepted, in which Corrpro and the officers neither admitted nor denied the facts alleged in the orders. On December 1, 1997, the Commission issued a cease-and-desist order against the former president, Robert Gossett, and the former chief financial officer, Ronald Langos, in which they were ordered to cease and desist from causing violations of Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act and Rule 12b-20, 13a-13 and 13b2-1 thereunder. On September 24, 1998, the Commission issued a cease-and-desist order against Corrpro and Richard Harr, the former comptroller, in which Corrpro was ordered to cease and desist from committing or causing, and Harr was ordered to cease and desist from causing, any violations of Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act and Rules 12b-20 and 13a-13 thereunder.

## OTHER RELEVANT ENTITIES

14. Corrpro Companies Australia Pty, Ltd. ("Corrpro Australia") was a subsidiary of Corrpro with its principal place of business in Melbourne, Australia. Corrpro Australia was created when Corrpro acquired Wilson Walton International in July 1998 and renamed it as Corrpro's Australian subsidiary. Corrpro sold Corrpro Australia on or about October 1, 2002. While it was a subsidiary of Corrpro, Corrpro Australia provided corrosion control products and services to the petroleum, utility, industrial, marine and offshore industries, and government infrastructure.

15. Greg Waring is a resident of Victoria, Australia. Waring, age 58, was Corrpro Australia's managing director (the equivalent of an American Chief Executive Officer) until

February 2002. As managing director, Waring was responsible for all activities of Corrpro Australia, and reported to Corrpro's Vice-President, International.

16. Craig Treloar is a resident of Wyndham Vale, Victoria, Australia. Treloar, age 41, was Corrpro Australia's financial accountant (the equivalent of an American Chief Financial Officer) until February 2002. Treloar resigned in February 2002 while Corrpro was conducting a review of Corrpro Australia's books and records.

## WARING AND TRELOAR ENGAGED IN A FRAUDULENT SCHEME TO FALSIFY THE ACCOUNTING RECORDS OF CORRPRO AUSTRALIA

17. Beginning in approximately October 2000, Waring, and Treloar at Waring's direction, began entering journal entries to Corrpro Australia's general ledger that increased profit and net assets. Among other falsifications, Waring and Treloar falsified invoices and credit notes, and made false entries to subledgers including accounts payable, accounts receivable, costs of goods sold and inventory, and falsified reporting packages sent to Corrpro.

18. In addition, before the year-end audit of fiscal year 2001 (year ended March 2001) by Corrpro's independent auditor, Treloar and Waring recorded fictitious invoices in Corrpro's computerized accounting records and, when requested by the auditor, later printed physical copies of the false invoices. Waring and Treloar also falsified credit notes from suppliers, and accordingly, the accounts payable ledger, to make it look like Corrpro Australia owed less money than it did. Ultimately, Treloar and Waring created two different versions of the "debtors subledger" (what U.S. accountants would call accounts receivable) beginning in April 2001.

19. In anticipation of a November 2001 accounting review by Corrpro Australia's independent auditors, Treloar e-mailed Waring two versions of a spreadsheet summarizing monthly results from April 2001 through September 2001. In order to ensure that the auditors

5

would review general ledger balances that matched those previously sent to Corrpro, Waring recorded false entries to the general ledger to increase profit in each month.

20. In December 2001, Corrpro instructed the controller of Corrpro Asia to visit Corrpro Australia to ensure that Corrpro Australia could produce the necessary reports for the auditor's review and to investigate possible accounting difficulties. Waring and Treloar had failed to cooperate by failing to provide the independent auditors with all of the information necessary for the auditors to complete their work in November 2001.

21. In January 2002, in anticipation of this visit, Waring instructed Treloar to request a second copy of Corrpro Australia's general ledger from the software support company that managed the program. Waring used the second copy of the general ledger to create support for the misstated results that Corrpro Australia had reported to Corrpro in its monthly reporting packages, from August 2001 through December 2001. Waring instructed the accounts receivable clerk to place the falsified physical subledger report in the Corrpro Australia files.

22. When the controller of Corrpro Asia arrived in Australia on February 7, 2002, he found that Waring and Treloar could or would not give him certain key financial records for his review. After he returned to Asia, Corrpro pressured Waring to get the controller of Corrpro Asia the records, but as of February 18, 2002, Waring and Treloar still had not produced the records. Thereafter, Treloar resigned.

23. During his second visit to Australia, the controller of Corrpro Asia began to review certain of Corrpro Australia's invoices and financial records that were available in the office. He found duplicate copies of some subledgers that bore different captions, which indicated to him that one of the copies was produced by a different system or at a different time. He also found

that some invoice numbers had been duplicated and altered, which indicated to him that some of the invoices were false.

24. The controller of Corrpro Asia asked the accounts receivable clerk for an explanation of the discrepancies in the invoices. She reported that just that day, Waring had asked her to falsify invoices and/or cash receipts and include them in the records provided to the controller of Corrpro Asia. Although Treloar had already resigned and no longer worked at Corrpro, the controller of Corrpro Asia called Treloar and met with him on the evening of February 26, 2002. Treloar said he and Waring had been falsifying Corrpro Australia's reports of revenue, costs of sales, receivables, inventory and other records. Treloar had kept a copy of what he claimed to be the actual financial statements, and shared that with the controller of Corrpro Asia who notified Corrpro of his discoveries. Corrpro placed Waring on administrative leave the next day and subsequently terminated his employment. Under the direction of its audit committee Corrpro commenced an investigation of the accounting irregularities discovered.

25. On March 20, 2002 Corrpro issued a press release disclosing that it had detected possible accounting irregularities at Corrpro Australia.

## CORRPRO'S INADEQUATE INTERNAL CONTROL STRUCTURE PERMITTED WARING'S AND TRELOAR'S FRAUD TO GO UNNOTICED.

26. Waring's and Treloar's deliberate fraud was the direct cause of Corrpro's reporting and record-keeping violations. In addition, Corrpro did discover the fraudulent scheme through its own investigation in February 2002. However, Corrpro's inadequate internal controls permitted the fraud to go forward undetected during portions of two fiscal years. Had Corrpro employed more stringent internal controls, Corrpro could have created an environment more

likely to prevent fraud, and also, could potentially have discovered the fraud much earlier than it did.

### a. Corrpro Grew its Business Without Sufficiently Strengthening its Accounting Staff and Controls.

27. Corrpro's accounting and management structure, along with its inadequate internal controls, allowed Waring and Treloar to continue their falsifications for as long as they did.

28. Corrpro acquired 24 companies between 1987 and 2000 worldwide that operated in Corrpro's core business or related businesses. Corrpro's failure to increase the size, quality of staff and reporting structure commensurate with its worldwide operational growth contributed to weaknesses in internal controls that in turn allowed Waring and Treloar to perpetrate their fraud.

29. Despite Corrpro's rapid operational growth, Corrpro did not adequately increase the size of its accounting staff. As a result, no one was specifically tasked with addressing Corrpro Australia's financial difficulties. Even though some Corrpro staff thought that Corrpro Australia's accounting function appeared to be sloppy, no one was charged with taking action to solve the problem.

30. Corrpro also failed to expand or modify the auditing and financial reporting structures in place between the parent company and its subsidiaries. In fiscal years 2000, 2001 and 2002, financial management of the worldwide subsidiaries was the responsibility of each subsidiary's managing director, who reported to Corrpro's vice-president/international. Corrpro's vice-president/international was at that time the only corporate management contact with direct supervision over the worldwide subsidiaries. Even though he served as the financial link to the subsidiaries, the vice-president/international was tasked only with managing Corrpro's core business, not monitoring the accuracy of the financial statements.

31. The accounting staff at the foreign subsidiaries reported to the managing directors, who in turn reported to the vice-president/international. Accounting staff at the foreign subsidiaries had a direct reporting relationship with their managing directors, but only a dotted line reporting relationship to Corrpro's accounting staff, and so Corrpro had no direct authority over accounting and reporting at the subsidiaries.

32. In February 2001, Corrpro's corporate controller suggested that Corrpro require controllers of the foreign subsidiaries to report to the corporate controller instead of the managing directors of the foreign subsidiaries. He also suggested that the corporate controller visit to the foreign subsidiaries on a regular basis to check on any financial issues. Corrpro did not implement these changes until Fall 2002.

33. Corrpro had no internal audit department, and therefore its subsidiaries were not subject to periodic internal financial and operational audits. Corrpro also did not employ other controls such as an international controller to conduct independent reviews and analysis of worldwide subsidiaries' reported financial condition and results of operations.

34. Corrpro's accounting staff was not familiar with foreign generally accepted accounting procedures ("GAAP"). As a result, all review of the foreign subsidiaries was performed only at year-end by Corrpro's independent public auditors.

**b.     Delay in Investigation.**

35. Although Corrpro discovered the fraud through its own internal investigation, there was a delay between the time Corrpro noticed inconsistencies in Corrpro Australia's financial reporting packages to the parent company, and the time Corrpro investigated.

9

36. By June 2001, Corrpro's controller noticed that Corrpro Australia's reported increases in operating profits were not producing comparable improvements in cash flow from operations. Rather than paying down outstanding lines of credit, Corrpro Australia's investments in accounts receivable and inventory continued to grow. The controller also noted that Corrpro Australia's May 2001 reporting package did not tie in with other reported results. However, Corrpro did not send Corrpro Asia's controller to investigate until February 2002.

37. Corrpro's delay in taking action on the increasingly significant failures in Corrpro Australia's accounting personnel and practices allowed Waring's and Treloar's fraud to continue into the 2002 fiscal year. Corrpro believed Corrpro Australia's evident financial difficulties were caused by incompetence on the part of the accounting staff, not fraud. Even so, when Corrpro sent Corrpro Asia's controller to investigate, he was able to detect Waring's and Treloar's fraud scheme by reviewing various records.

## THE IMPACT OF CORRPRO'S INADEQUATE INTERNAL CONTROLS

38. Corrpro did not file its 10K report for fiscal 2002 due July 1, 2002 until July 16th when it indicated that it would file required financial statements by later amendment. On August 9, 2002 Corrpro filed an amendment which included restated financials for 2001 and for each of the first three quarters for the year ended March 2002.

39. The fraud committed by Waring and Treloar, which was not detected until February 2002 by CorrPro's inadequate internal controls, caused inaccuracies in Corrpro Australia's accounting records, which then caused major inaccuracies in the financials included in Corrpro's Form 10-K for the year ended March 31, 2001, and its Forms 10-Q for the next three quarters. The Form 10-K was filed with the Commission on July 13, 2001 and the Forms 10-Q were filed

on August 14, 2001, November 14, 2001 and February 14, 2002 respectively.

40. As a result, Corrpro was forced to restate its financials with changes from its previously stated figures. Corrpro's net loss for the year ended March 31, 2001 was increased by $3.6 million, from a previously reported $4.7 million to $8.3 million. The company's net worth as of March 31, 2001 was reduced by $3.8 million from $ 45.3 million. Quarterly net income for the first three quarters of the year ended March 2002 were restated and reduced. Net income for the first quarter was reduced by $491,000 from a previously reported $225,000 to a loss of $266,000; net income for the second quarter was reduced by $763,000 from a previously reported $897,000 to $134,000; and net income for the third quarter reduced by $467,000 from a previously reported $545,000 to $78,000.

41. Corrpro Australia's filing of the equivalent of Chapter 11 bankruptcy caused Corrpro to write off the remainder of its investment ($2.48 million) in Corrpro Australia during the fourth quarter, citing loss of operating control due to Corrpro Australia filing bankruptcy.

42. The revelation of Waring's and Treloar's fraud also had a major impact on Corrpro's stock price causing large losses for the company's shareholders. On March 19, 2002, the day before Corrpro announced these problems, its stock closed at $2.30. On March 21, 2002, the day after Corrpro disclosed that it had detected possible accounting irregularities at Corrpro Australia, the stock closed at $1.10 --- a decline of over 52%. As a result, Corrpro's market capitalization declined approximately $10 million.

## ACTIONS TAKEN BY CORRPRO SINCE THE DISCOVERY OF THE FRAUD

43. Corrpro's then-inadequate internal control structure contributed to Waring's and Treloar's ability to perpetrate their fraud that affected Corrpro's financial reporting. However,

upon discovering the fraud, Corrpro reported the problem to the Commission on March 21, 2002, cooperated in the staff's investigation, and voluntarily adopted measures to strengthen its financial reporting policies and internal control structure to prevent such fraud from happening in the future.

44. Corrpro's Audit Committee hired an independent public accounting firm to investigate the specific instance of Waring's and Treloar's fraud at Corrpro Australia. Corrpro cooperated with the investigation and has acted on the conclusions of the report, including:

- Corrpro instructed its outside auditors to expand the scope of the audit work beginning in fiscal year ended March 31, 2002 at all foreign operations, and to expand their scope of quarterly reviews effective beginning December 31, 2002.

- Corrpro's Audit Committee established an internal audit function that reports directly to the Committee. The internal audit function has been established through an outsourcing agreement with an independent firm specializing in performing internal audit services and related work. Among other things, the independent firm will:

    - perform an assessment of Corrpro's risk environment, specifically, its exposure to fraudulent or inaccurate activities that could have a material effect on Corrpro's financial reports;

    - develop a plan for internal audit of the subsidiaries, offices or locations where the risk is considered most significant

    - perform Corrpro's internal audit function;

    - assist Corrpro's accounting staff with revising its accounting policies and procedures; and

    - outline for Corrpro the basic staffing and resource needs to meet satisfactorily the statutory requirements for accurate and timely accounting and financial reporting, in order for Corrpro to improve its accounting staff's strength.

- Corrpro's Audit Committee instructed Corrpro to change its reporting relationships. As of September 2002, all controllers of worldwide subsidiaries or reporting entities outside North America now report directly to the newly created position of International Controller.

- Corrpro expanded the responsibilities of the accounts receivable management team. Corrpro now conducts monthly analysis of receivables activity for each operating unit.

- Corrpro has undertaken a restructuring of its business following the discovery of the fraud at Corrpro Australia. Corrpro decided to divest most of its international operations outside of North America as well as its non-core domestic business units.

## COUNT I
### Violations of Section 13(a)
### of the Exchange Act [15 U.S.C. § 78m(a)] and
### Rules 12b-20, 13a-1 and 13a-13 thereunder
### [17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-13]

45. Paragraphs 1 through 44 are realleged and incorporated herein by reference.

46. Between at least July 2001 through February 2002, Corrpro filed with the Commission financial statements in its annual reports on Form 10-K and quarterly reports on Form 10-Q that contained false financial data.

47. Between at least July 2001 through February 2002, Corrpro, directly and indirectly, filed with the Commission annual reports on Form 10-K and quarterly reports on Form 10-Q that were not in accordance with such rules and regulations that the Commission has prescribed as necessary and appropriate in the public interest and for the protection of investors, and also failed to include in those reports such further material information as was necessary to make the required statements, in light of the circumstances under which they were made, not misleading, as more fully described in paragraphs 1 through 44 above.

48. As a result of the conduct alleged in Paragraphs 1 through 44, Corrpro violated Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 12b-20, 13a-1 and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-13].

## COUNT II

### Violations of Section 13(b)(2)(A) and
### 13(b)(2)(B) [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)] of the Exchange Act

49. Paragraphs 1 through 44 are realleged and incorporated herein by reference.

50. From at least October 2000 through February 2002, Corrpro, directly and indirectly, failed to make and keep books, records and accounts, which in reasonable detail accurately and fairly reflected the transactions and disposition of the assets of Corrpro, as more fully described in paragraphs 1 through 44 above.

51. From at least October 2000 through February 2002, Corrpro failed to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions were recorded as necessary to permit preparation of financial statements in conformity with GAAP or any other criteria applicable to such statements as more fully described in paragraphs 1 through 44 above.

52. As a result of the conduct alleged in paragraphs 1 through 44, Corrpro violated Section 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)].

### PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that the Court:

### I.

Issue findings of fact and conclusions of law that the Defendants committed the violations charged and alleged herein.

## II.

Issue an Order of Permanent Injunction, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently restraining and enjoining Corrpro, its officers, agents, servants, employees, attorneys and those persons in active concert or participation with it who receive actual notice of the Order, by personal service or otherwise, and each of them from, directly or indirectly, engaging in the acts, practices or courses of business alleged above, or in conduct of similar purport and object, as principals or aiders and abettors, in violation of Sections 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(a), 78m(b)(2)(A) and 78m(b)(2)(B)] and Rules 12b-20, 13a-1 and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1 and 240.13a-13].

## IV.

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## V.

Grant Orders for such further relief as the Court may deem appropriate.

Respectfully submitted,

*[signature]*

Cynthia S. Baran (primary contact)
Charles J. Kerstetter
Peter K.M. Chan
Attorneys for Plaintiff
United States Securities and Exchange Commission
175 West Jackson Boulevard, Suite 900
Chicago, IL 60604-2615
(312) 353-7390

Dated: January 16, 2004